Jesse Beaudette
Brandon R. Shannon
BOHYER, ERICKSON, BEAUDETTE & TRANEL, P.C.
283 West Front, Suite 201
Post Office Box 7729
Missoula, Montana  59807-7729
Telephone: (406) 532-7800
Facsimile: (406) 549-2253
Email:  mail@bebtlaw.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. STEO 1273-1907,<br><br>Plaintiffs,<br><br>v.<br><br>MOUNTAIN TITLE COMPANY, JAMES TALCOTT CONSTRUCTION, INC.,<br><br>Defendants. | Case No. CV-21-45-GF-BMM-JTJ<br><br>**COMPLAINT FOR DECLARATORY RELIEF PURSUANT TO 22 U.S.C. 2201** |

Plaintiff, Certain Underwriters at Lloyd's, London, subscribing to Policy No.

STEO 1273-1907 ("Plaintiffs" or "Underwriters") through their undersigned

counsel, submits their Complaint for Declaratory Relief against Defendants

Mountain Title Company ("Mountain Title") and James Talcott Construction, Inc. ("JTC"), and alleges as follows:

## PRELIMINARY STATEMENT

1.     This is an action for declaratory judgment brought pursuant to 28 U.S.C. §§ 2201, *et seq.*  Underwriters request a declaration of their rights and obligations under a Title Agents, Abstractors and Escrow Agents Professional Lability Insurance Policy, Policy No. STEO 1273-1907 (the "Policy"), issued to Mountain Title in connection with the below-referenced matter.  Specifically, Underwriters seek a declaration that Underwriters have no duty to defend or indemnify Mountain Title under the Policy in connection with two lawsuits.  The first, styled *Liberty Mutual Insurance Company v. James Talcott Construction, Inc., et al.,* Case No. 4:19-cv-00050 BMM, was filed in the U.S. District Court for the District of Montana (the "Liberty Mutual Lawsuit").  The second, styled *James Talcott Construction, Inc. v. Citizens Alliance Bank, et al.,* Case No. BDV-20-0065, is currently pending in Montana's Eighth Judicial District Court, Cascade County (the "JTC Lawsuit") (the Liberty Mutual Lawsuit and the JTC Lawsuit are at times referred to as the "Underlying Lawsuits").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction under 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties.

3.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a)(3) as defendant Mountain Title is a resident of the State of Montana and resides in Great Falls, Montana.

## THE PARTIES

4.     Mountain Title is a corporation formed under the laws of the State of Montana.  Mountain Title's principal place of business is located at 325 1st Avenue North, Great Falls, Montana 59401.

5.     JTC is a corporation incorporated under the laws of the State of Montana.  JTC's principal place of business is located at 4415 River Dr. N. Great Falls, Montana 59403.

6.     Underwriters subscribing to Policy No. STEO 1273-1907 are members of the following Lloyd's syndicates: Syndicate 5678 (Vibe Corporate Member Ltd.), Syndicate 3000 (managed by its sole member, Markel Capital Limited), Syndicate 3334 (Hamilton Corporate Member Limited), and Syndicate 382 (Hardy Underwriting Limited).  These entities are organized and incorporated outside the United States, with their principal business outside the United States.

No member of the foregoing syndicates is domiciled in the State of Montana.  As such, there is complete diversity of citizenship between Mountain Title, JTC, and Underwriters.

7.     The sole member of Syndicate 5678 is Vibe Corporate Member Ltd. ("Vibe"), a corporation organized and existing under the laws of England and Wales with its principal place of business at 71 Fenchurch Street, London, United Kingdom EC3M 4BS.  For the purposes of diversity, Vibe is a citizen of the United Kingdom.

8.     The sole member of Syndicate 3000 is Markel Capital Limited ("Markel") which is a private limited company organized and existing under the laws of England and Wales with its principal place of business at 20 Fenchurch Street, London, United Kingdom EC3M 3AZ.  For the purposes of diversity, Markel is a citizen of the United Kingdom.

9.     The sole member and capital provider of Syndicate 382 is Hardy Underwriting Limited ("Hardy"), a private limited company which is organized and incorporated under the laws of England and Wales with its principal place of business at 20 Fenchurch Street, London, United Kingdom EC3M 3BY.  For the purposes of diversity, Hardy is a citizen of the United Kingdom.

10.    The sole member of Syndicate 3334 is Hamilton Corporate Member Limited ("Hamilton"), a private limited company which is organized and

incorporated under the laws of England and Wales, with its principal place of business located at Level 3, 8 Fenchurch Place, London, United Kingdom EC3M 4AJ.  For the purposes of diversity, Hamilton is a citizen of the United Kingdom.

11.    Underwriters issued the Policy to Mountain Title as Named Insured. A true and accurate copy of the Policy is attached as **Exhibit A**.

## FACTUAL BACKGROUND

### The Policy

12.    The Policy, which is a claims-made-and-reported policy, is effective for the "Policy Period"[1] of March 1, 2019 to March 1, 2020.  The Policy contains a per "Claim" and annual aggregate limit of liability of $1,000,000 subject to a per "Claim" deductible of $5,000.  The limit of liability shall be reduced and may be exhausted by amounts incurred as "Claims Expenses," and "Claims Expenses" shall be applied to the deductible.  Underwriters have a duty to defend covered "Claims" pursuant to the Policy.

13.    Section I.1.a. of the Policy, titled "Insuring Agreement," provides, in relevant part, the scope of coverage afforded by the Policy, as follows:

> 1.  Insuring Agreement
>
>> a.  We shall pay on behalf of an "Insured" those sums in excess of the deductible that the "Insured" becomes legally obligated to pay as "Damages" and "Claims

---

[1]    Terms in quotations, other than shorthand references used herein, are defined in the Policy.

Expenses" as a result of the "Claim" first made against the "Insured" and reported to us in writing during the "Policy Period" or "Extended Reporting Period" by reason of a "Wrongful Act" in the performance of or failure to perform "Professional Services" by the "Insured" or by any other person or entity for whom the "Insured" is legally liable. The "Wrongful Acts" must have been committed on or subsequent to the Retroactive Date specified in the Declarations and before the end of the "Policy Period."

14.     Section I.1.b. of the Policy provides, in relevant part, as follows:

With respect to any suit, arbitration or other legal action brought against an "Insured" seeking "Damages", and subject to all the Policy terms, limits, exclusions, duties, rules, and conditions, Underwriters may, at their sole discretion, advance the costs of defense in any such suit, arbitration or other legal action until it is determined by a court of competent jurisdiction that the "Insured" is not entitled to coverage for the "Claim". In the case of such determination, the Insured shall be obligated to repay to Underwriters all costs of defense advanced by Underwriters in defending any "Claim" not covered pursuant to this Policy.

15.     Section II. of the Policy provides the following relevant definitions:

B.     "Claim" means a written demand for monetary damages arising out of or resulting from the performance or failure to perform "Professional Services".

C.     "Claims Expenses" means:

(1) attorneys' fees, expert witness fees and other reasonable fees and costs incurred by us or by you with our prior written consent, in the investigation and defense of covered "Claims";

(2) reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment defense and appeal of a "Claim", including the cost of appeal

bonds, however, we shall not be obligated to apply for or furnish appeal bonds on your behalf.

"Claims Expenses" does not include wages or salaries or costs associated with employees or officials of the "Named Insured".

All "Claims Expenses" are a part of and subject to the Limit of Liability and Deductible and shall not be considered sums payable in addition thereto.

D.   "Damages" means any compensatory amount which you become legally obligated to pay as a result of a covered "Claim", including judgments, awards and settlements.

"Damages" shall not include:

(1) civil or criminal fines, penalties, sanctions, whether pursuant to law, statute, regulation or court rule;

(2) punitive and exemplary damages and the multiplied portion of multiplied damages;

(3) any matter, sum or award that is uninsurable under any applicable law; or

(4) the cost to comply with or defend against an injunction or other non-monetary or declaratory relief.

\*     \*     \*

F.   "Insured" means the "Named Insured" and:

(1)   any past, present, or future principal, partner, officer, director, stockholder, trustee or employee of the "Named Insured" but only with respect to "Professional Services" performed on behalf of the "Named Insured";

(2)   independent contractors who are natural persons, or any temporary or leased personnel but only while acting under the direct supervision of the "Named Insured" and on your behalf;

(3) the estate, heirs, executors, administrators or legal representatives of any "Insured" described in subpart (1) or (2) above in the event of such "Insured's" death, incapacity, insolvency, or bankruptcy but only to the extent that such "Insured" would otherwise be provided coverage under this Policy; or

(4) any "Subsidiary".

\* \* \*

H. "Policy period" means the period of time shown in the Declarations.

I. "Professional Services" means only those services performed by any "Insured" for others for a fee in any of the following capacities:

(1) Title Insurance Agent,
(2) Title Abstractor,
(3) Title Searcher,
(4) Escrow Agent,
(5) Closing Agent,
(6) Notary Public and Mortgagee Notary Signing Agent,
(7) Public Records Searcher (including UCC searches),
(8) Corporate Document Searcher,
(9) Flood Zone Certifications, or
(10) Witness Closer.

\* \* \*

O. "Wrongful Act" means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty in the performing of or failure to perform "Professional Services".

16. Section III. of the Policy, titled "Exclusions," provides that the Policy does not apply to any "Claim" against the "Insured":

a.   Based on or directly or indirectly arising out of:

(1)   A "Professional Service" performed and those services that should have been performed or were omitted prior to the effective date of the Policy if any "Insured" knew or could have reasonably foreseen that the "Professional Service" could give rise to a "Claim";

(2)   Any common fact, circumstance, transaction advice or decision involved in a "Professional Service" reported as a "Claim" or potential "Claim" under any prior Policy; or

(3)   Any "Claim", suit, act, error, or omission disclosed in the application for this Policy.

\*   \*   \*

k   Based on or directly or indirectly arising out of any duty to record, file, preserve, or perfect any legal, equitable, beneficial, or other interest in any personal property of any kind.

17.   Section VII.2. of the Policy, titled "Notice of 'Claims', or Potential 'Claims'," provides as follows:

Notice of An Actual "Claim**"**

As a condition precedent to our obligations under this Policy, an "Insured" shall give written notice to us in accordance with the Claims Notification Endorsement attached hereto as soon as practicable, but in no event later than 60 days after the end of the "Policy Period" of any "Claim" made against any "Insured". The "Insured" shall immediately forward to us every demand, notice, summons or process or pleading received by the "Insured" or its representative.  An "Insured" will not, except at its own cost, voluntarily make any payment, assume any

obligation, or incur any expense.  There is no coverage under this Policy for such payment, obligation, or expense.

Notice of A Potential "Claim"

If during the "Policy Period" an "Insured" shall become aware to any "Wrongful Act" that may reasonably be expected to be the basis of a "Claim" against the "Insured" and if the "Insured" shall during the "Policy Period" give written notice to us in accordance with the Claims Notification Endorsement of such "Wrongful Act" and the reason for anticipating a "Claim", including but not limited to the:

1.      Specific "Wrongful Act",

2.      "Damages" which have or may result from such "Wrongful Act", and

3.      Circumstances by which the "Insured" first became aware of such        "Wrongful Act"

then any such "Claim" that may be subsequently made against the "Insured" arising out of such "Wrongful Act" shall be deemed for the purposes of this insurance to have been made during the "Policy Period".

18.     Section VII.5. of the Policy, titled "Other Insurance," provides as follows:

This Policy shall be excess over any other valid and collectible insurance, self-insurance or indemnification available to any "Insured", whether such other insurance or indemnification is stated to be primary, contributory, excess, contingent, self-insurance or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability of this Policy.

19.     Section VII.6 of the Policy, titled "Representations," provides as follows:

6.    Representations

By accepting this Policy, the "Named Insured" agrees that:

A.    The statements in the applications are accurate and complete;

B.    Those statements are material representations you made to us; and

C.    We have issued this Policy in reliance upon your representations.

## The Underlying Lawsuits

### The Liberty Mutual Lawsuit

20.    On or about July 24, 2019, Liberty Mutual Insurance Company ("Liberty Mutual") filed the Liberty Mutual Lawsuit against JTC and several other entities and individuals.  A true and correct copy of the complaint in the Liberty Mutual Lawsuit is attached as **Exhibit B**.

21.    As alleged by Liberty Mutual, Liberty Mutual, acting as surety, issued several construction payment and performance bonds to JTC.  JTC and others allegedly executed a written indemnity agreement by which they granted Liberty Mutual broad surety rights to investigate, defend, and pay claims.

22.    After Liberty Mutual incurred in excess of $1 million in claims under the bonds alleging that JTC failed to properly pay for labor and materials in relation to several construction projects, Liberty Mutual requested defense and

indemnity "jointly and severally" from JTC and others.  When JTC and the other guarantors allegedly refused to discharge Liberty Mutual from its obligations under the bonds and deposit $1.6 million in certified funds to cover any losses, Liberty Mutual filed the Liberty Mutual Lawsuit.

23.     On or about November 26, 2019, Mountain Title reported the Liberty Mutual Lawsuit to Underwriters.

24.     The parties to the Liberty Mutual Lawsuit, which did not include Mountain Title as a defendant, requested that Mountain Title participate in a settlement conference to be held on December 17, 2019.

### The JTC Lawsuit

25.     On December 2, 2019, Mountain Title provided Underwriters with a Draft Complaint it had received from JTC asserting that Mountain Title failed to properly ensure that JTC had priority over a buyer's bank's interest in assets being sold by JTC and subjected JTC to damages.

26.     On February 5, 2020, JTC filed a Complaint and Demand for Jury Trial against  Mountain Title and Citizens Alliance Bank ("CAB").  A true and correct copy of the Complaint in the JTC Lawsuit is attached hereto as **Exhibit C**.

27.     On March 24, 2020, JTC filed an Amended Complaint and Demand for Jury Trial in the JTC Lawsuit.   A true and correct copy of the Amended Complaint in the JTC Lawsuit is attached hereto as **Exhibit D**.

28.     In the JTC Lawsuit, JTC alleges that it operated a general building construction company in which Bradley B. Talcott ("Mr. Talcott") is the President. JTC further alleges that on or about June 30, 2017, it entered into an Asset Purchase Agreement ("Agreement") with Talcott Holdings, Inc. and Talcott Construction, Inc. (the "Buyers") to sell off its assets for $2,500,000.  Aaron L. Perry ("Mr. Perry") is the President of both the buying companies.

29.     JTC alleges that the Agreement provided that the following assets were to be sold: real property located at 4415 River Drive North, Great Falls, Montana (the "Premises"), and equipment, including vehicles, heavy machinery, ground heaters, and generators, along with other miscellaneous inventories and items of personal property (the "Personal Property").

30.     JTC alleges that, pursuant to the Agreement, the Buyers were required to execute a promissory note for the $2,500,000 purchase price, a Security Agreement and trust indentures in favor of JTC collateralizing the Premises to secure payment.  The Agreement included a provision which stated that any liens, encumbrances, or security interests that are attached after the Agreement's execution are subordinate to JTC's security interest in the Premises and Personal Property.

31.     Following the execution of the Agreement, JTC alleges that the Buyers and JTC engaged Mountain Title to provide closing and settlement services in connection with the transaction.

32.     JTC alleges that on June 30, 2017, Talcott Construction, Inc. ("TCI") entered into an agreement with CAB to acquire a $2,500,000 line of credit (the "Loan").  JTC further alleges that CAB also provided a separate loan to TCI for $500,000.

33.     JTC also alleges that both CAB and Mountain Title were in possession of the agreement, and were aware of the provision prohibiting the subordination of its trust indentures and/or the Security Agreement prior to closing.

34.      JTC alleges that prior to closing CAB notified Mountain Title that it would be filing the two trust indentures ($2,500,000 and $500,000) on the Premises to secure each loan.

35.     JTC further alleges that on June 29, 2019 [*sic*], Mountain Title employee, Valerie Smelser, responded to CAB, confirming that "[Mr. Talcott's] purchase note from ["Mr. Perry"] will be first position and CAB's 2 notes will be in 2nd and 3rd."  JTC alleges that, on the same day, CAB employee, Ryan Fritz, responded by advising Ms. Smelser that Mr. Talcott would be subordinate to CAB.

36.     JTC claims that neither Mountain Title nor CAB contacted Mr. Talcott to confirm that JTC's interest would be subordinated.  JTC states that it did

not agree to subordinate its security interest in the Premises and the Personal Property.  The transaction closed on June 30, 2017.

37.    JTC alleges that due to its security interests in the Premises and Personal Property being wrongfully subordinated, it is left in a virtually unsecured position for repayment of the $2,500,000 purchase price as required under the Agreement.

38.    JTC alleges that in December 2018, Mr. Talcott discovered that JTC's security interests in the Premises and Personal Property had been subordinated to that of CAB's interests.  JTC claims that, at that time, the Buyers were in default to JTC, resulting in JTC "now behind millions of dollars in debt allegedly owed to CAB."

39.    JTC alleges that Mountain Title owed it a duty of care in closing the transaction.  JTC further alleges that this duty was breached when Mountain Title, *inter alia*, wrongfully subordinated JTC's security interests in the Premises and Personal Property to CAB's security interests in the Premises and the Personal Property, failed to contact Mr. Talcott to determine from him whether JTC had agreed to subordinate its security interests in the Premises and the Personal Property to CAB's security interests, and closed the transaction and Loan in a manner contrary to the terms of the Agreement.

## Underwriters' Coverage Investigation

40.     On November 26, 2019, Ms. Smelser of Mountain Title completed a Claim Reporting Form and attached supplemental documentation regarding the Underlying Lawsuits.

41.     In   the   Claim   Reporting   Form   and   attached   supplemental documentation, Ms. Smelser states that she received notice from an attorney from Mr. Talcott inviting her to participate in a mediation related to the Liberty Mutual Lawsuit.

42.     In addition to the Claim Reporting Form and the attached documentation, Ms. Smelser attached email correspondence, loan documentation and notes in connection with her November 26, 2019 notice to Underwriters.  In particular, Ms. Smelser provided Underwriters with a copy of a December 21, 2018 e-mail from Mr. Talcott to her, which specifically notes that "[Mountain Title] clearly erred by accepting your word, without anything in writing from JTC consenting to the same, that the bank's two trust indentures should be recorded prior to JTC's."  The email further notes that "this must be corrected, otherwise a claim will be made against [Mountain Title] and its E&O carrier."

43.     By letter dated January 7, 2020, Underwriters informed Mountain Title that it agreed to provide Mountain Title with a defense in connection with the

Liberty Mutual Lawsuit and the Draft Complaint of the JTC Lawsuit, subject to an ongoing reservation of rights (the "Reservation of Rights Letter").

44.     In the Reservation of Rights Letter, Underwriters reserved their rights, *inter alia*, to disclaim coverage and deny any duty to defend or indemnify Mountain Title because the Underlying Lawsuits did not constitute a Claim "first made" during the Policy Period of the Policy.

45.     In the Reservation of Rights Letter, Underwriters reserved their rights, *inter alia*, to disclaim coverage and deny any duty to defend or indemnify Mountain Title as to Exclusion a.(1), which excludes from coverage any "Claim" against the "Insured" based on or arising out of a "Professional Service performed and those services that should have been performed or were omitted prior to the effective date of the Policy if any "Insured" knew or could have reasonably foreseen that the "Professional Service" could give rise to a "Claim."

46.     Underwriters also reserved their rights, *inter alia*, to disclaim coverage and deny any duty to defend or indemnify Mountain Title as to Exclusion k., which excludes from coverage any "Claim" against the "Insured" based on or directly or indirectly arising out of any duty to preserve or perfect any legal, equitable, beneficial or other interest in any personal property of any kind.

47.     Further, Underwriters reserved their rights to deny coverage under the Known Loss Doctrine, as Mountain Title had sufficient information to know or

reasonably believe that it would be subject to the claims alleged in the JTC Draft Complaint as early as December 21, 2018, prior to the inception of the "Policy Period."

48.     Finally, Underwriters reserved their rights that the Draft Complaint seeks non-monetary relief that falls outside the Policy's definition of "Damages," that Underwriters is entitled to an allocation of both covered and uncovered matters, and that Underwriters is entitled to seek reimbursement for all costs advanced by Underwriters in defending any "Claim" not covered by the Policy.  In furtherance of Underwriters' investigation, Mountain Tile was also requested to provide additional information.

49.     By letter dated March 3, 2020, Mountain Title, through its counsel, provided a copy of the Complaint filed in the JTC Lawsuit and responded to Underwriters' Reservation of Rights Letter.

50.     Subsequently, Underwriters requested additional information from Mountain Title that was referenced in the March 3, 2020 letter.

51.     By letter dated December 1, 2020, Mountain Title provided certain additional information to Underwriters.

52.     By letter dated December 31, 2020, Underwriters further responded to Mountain Title concerning the agreement to provide Mountain Title with a defense

in connection with the Liberty Mutual Lawsuit and the JTC Lawsuit, subject to an ongoing reservation of rights.

## INSURANCE COVERAGE DISPUTE

53.     Mountain Title seeks insurance coverage from Underwriters under the Policy in connection with the Liberty Mutual Lawsuit and the JTC Lawsuit.

54.     Underwriters dispute that coverage exists for the Liberty Mutual Lawsuit and the JTC Lawsuit under the Policy.

55.     An actual, present and bona fide controversy exists between Underwriters and Mountain Title with respect to whether there is insurance coverage for the Liberty Mutual Lawsuit and the JTC Lawsuit under the Policy.

56.     A judicial declaration is necessary to establish the parties' rights and duties, if any, under the Policy.

## COUNT I – DECLARATORY JUDGMENT
## (Declaratory Judgment – No Claim First Made During Policy Period)

57.     Underwriters incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 56 as though set forth fully herein.

58.     The Policy's insuring agreement provides coverage only for "'Claim[s]' first made against the 'Insured' and reported to us in writing during the 'Policy Period.'"

59.     Mountain Title was aware of the "Claim" as early as December 21, 2018, prior to the Policy's March 1, 2019 inception date.

60.     Mountain Title did not report the Claim to Underwriters until November 26, 2019.

61.     Therefore, there is no coverage for the Underlying Lawsuits under the Policy because the Underlying Lawsuits are not a "Claim" first made during the "Policy Period" of the Policy.

WHEREFORE, Plaintiff, Certain Underwriters at Lloyds, London subscribing to Policy No. STEO 1273-1907, respectfully request that this Court enter an Order:

a.     Declaring that Underwriters have no duty to defend or indemnify Mountain Title in the Liberty Mutual Lawsuit or the JTC Lawsuit;

b.     Granting Underwriters costs of suit incurred herein; and

c.     Awarding such other, further relief as this Court deems just and proper.

## COUNT II – DECLARATORY JUDGMENT
### (Declaratory Judgment – Coverage is barred under Exclusion a.(1))

62.     Underwriters incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 61 as though set forth fully herein.

63.     Exclusion a.(1) excludes from coverage any "Claim" based on or directly or indirectly arising out of a "Professional Service" performed prior to the

effective date of the Policy if any "Insured" knew or could reasonably have foreseen that the "Professional Service" would give rise to a claim.

64.     Mountain Title's "Professional Services" at issue in the Underlying Lawsuits was performed prior to the March 1, 2019 inception date of the Policy

65.     An email from Mr. Talcott of JTC to Ms. Smelser of Mountain Title dated December 21, 2018 makes clear that Mountain Title was aware as early as that date that JTC claimed Mountain Title had erred by permitting JTC's security interests to be subordinate to CAB's without first confirming or seeking JTC's authorization.

66.     The email from Mr. Talcott specifically notes that if the security positioning is not corrected, "a claim will be made against [Mountain Title] and its E&O carrier."

67.     As such, Exclusion a.(1) of the Policy precludes coverage for the Underlying Lawsuits.

WHEREFORE, Plaintiff, Certain Underwriters at Lloyds, London subscribing to Policy No. STEO 1273-1907, respectfully request that this Court enter an Order:

a.     Declaring that Underwriters have no duty to defend or indemnify Mountain Title in the Liberty Mutual Lawsuit or the JTC Lawsuit;

b.     Granting Underwriters costs of suit incurred herein; and

c.   Awarding such other, further relief as this Court deems just and proper.

## COUNT III – DECLARATORY JUDGMENT
### (Declaratory Judgment – Coverage is limited under Exclusion k. (in the alternative to COUNT I))

68.   Underwriters incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 67 as though set forth fully herein.

69.   Exclusion k. excludes from coverage any "Claim" based on or directly or indirectly arising out of any duty to preserve or perfect any legal, equitable, beneficial or other interest in any personal property of any kind.

70.   JTC alleges that Mountain Title negligently failed to ensure that its security interest in the Property, which is defined in the JTC Lawsuit as "equipment, including vehicles, heavy machinery, ground heaters, and generators, along with other miscellaneous inventories and items of personal property," was superior to CAB's security interest in the Property.

71.   As such, Exclusion k. of the Policy precludes coverage for the Underlying Lawsuits.

WHEREFORE, Plaintiff, Certain Underwriters at Lloyds, London subscribing to Policy No. STEO 1273-1907, respectfully request that this Court enter an Order:

a.   Declaring that Underwriters have no duty to defend or indemnify Mountain Title in the Liberty Mutual Lawsuit and the JTC Lawsuit to the extent that the Underlying Lawsuits allege negligence based on

any duty to record, preserve, or perfect any legal, equitable, beneficial or other interest in personal property;

b.      Granting Underwriters costs of suit incurred herein; and

c.      Awarding such other, further relief as this Court deems just and proper.

## COUNT IV – DECLARATORY JUDGMENT
### (Coverage is barred by the Known Loss Doctrine)

72.     Underwriters incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 71 as though set forth fully herein.

73.     On or about December 21, 2018, Ms. Smelser of Mountain Title was aware that Brad Talcott intended to make a claim under her Errors and Omissions policy due to Mountain Title's alleged failure to ensure that JTC's security interest was superior to that of CAB.

74.     Prior to the March 1, 2019 inception of the Policy, Mountain Title was aware that Brad Talcott and/or JTC may make a claim against Mountain Title for its failure to ensure that JTC's security interest was superior to that of CAB.

75.     Mountain Title knew or had reason to know that there was a substantial probability that loss or liability would result to Mountain Title as a result of the transaction.

76.     As a result, there is no coverage available under the Policy for the Underlying Lawsuits pursuant to the common law known loss doctrine and/or loss in progress doctrine.

WHEREFORE, Plaintiff, Certain Underwriters at Lloyds, London subscribing to Policy No. STEO 1273-1907, respectfully request that this Court enter an Order:

a. Declaring that Underwriters have no duty to defend or indemnify Mountain Title in the Liberty Mutual Lawsuit or the JTC Lawsuit pursuant to the known loss doctrine and/or loss in progress doctrine;

b. Granting Underwriters costs of suit incurred herein; and

c. Awarding such other, further relief as this Court deems just and proper.

### COUNT V
### (Declaratory Judgment – Underwriters entitled to apportionment for covered and uncovered Claims Expenses and Damages (in the alternative to COUNT I))

77. Underwriters incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 76 as though set forth fully herein.

78. To the extent that the Liberty Mutual Lawsuit and the JTC Lawsuit involve both covered and uncovered matters, Underwriters are entitled to an allocation of covered and uncovered "Claims Expenses" and "Damages."

WHEREFORE, Plaintiff, Certain Underwriters at Lloyds, London subscribing to Policy No. STEO 1273-1907, respectfully request that this Court enter an Order:

a. Declaring that the Liberty Mutual Lawsuit and the JTC Lawsuit contain both covered and uncovered claims;

b.      Reimbursing Underwriters for "Claims Expenses" and "Damages" spent on uncovered claims;

c.      Granting Underwriters costs of suit incurred herein; and

d.      Awarding such other, further relief as this Court deems just and proper.

## COUNT VI – DECLARATORY JUDGMENT
### (Declaratory Judgment – Underwriters are entitled to reimbursement)

79.     Underwriters incorporate by reference each and every allegation set forth in the preceding paragraphs 1 through 78 as though set forth fully herein.

80.     Underwriters assert that Mountain Title is not entitled to coverage for the Liberty Mutual Lawsuit and the JTC Lawsuit, yet Underwriters have undertaken Mountain Title's defense pursuant to a reservation of rights.

81.     Underwriters is entitled to reimbursement from Mountain Title of all costs of defense advanced by Underwriters in connection with the Liberty Mutual Lawsuit and the JTC Lawsuit.

WHEREFORE, Plaintiff, Certain Underwriters at Lloyds, London subscribing to Policy No. STEO 1273-1907, respectfully request that this Court enter an Order:

a.      Declaring that there is no coverage afforded under the Policy for the Liberty Mutual Lawsuit and the JTC Lawsuit;

b.      Reimbursing Underwriters for "Claims Expenses" and "Damages" advanced on behalf of Mountain Title with regard to the Liberty Mutual Lawsuit and the JTC Lawsuit;

c.    Granting Underwriters costs of suit incurred herein; and

d.    Awarding such other, further relief as this Court deems just and proper.

## **RESERVATION OF RIGHTS**

The Policy contains terms, conditions, and exclusions that may be relevant to the Underlying Lawsuits, but that are not currently implicated by this declaratory judgment action.  Nothing in this Complaint should be construed as a waiver by Underwriters of any coverage defenses under the Policy.  Underwriters continue to reserve the right to raise all other terms and conditions as defenses to coverage for any claim made under the Policy, where appropriate.

## **JURY DEMAND**

Underwriters demand a jury trial.

DATED this 23rd day of April, 2021.


          /s/ Jesse Beaudette
          Jesse Beaudette
          BOHYER, ERICKSON,
          BEAUDETTE & TRANEL, P.C.
          *Attorneys for Plaintiffs*